# EXHIBIT 1

STATE OF MINNESOTA | DISTRICT COURT

COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT

Court File No.

Berens & Miller, PA, and Barbara
Berens

        Plaintiffs,

vs.

Apex Funding Source LLC,
Rob Eisenberg, and Jane
and John Doe Investors,

        Defendants.

**SUMMONS**

**THIS SUMMONS IS DIRECTED TO: ROB EISENBERG**

1.    **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.    **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called <u>service</u>. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

    ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at <u>www.mncourts.gov/forms</u> under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.    **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can then be entered against you for what the Plaintiff asked for in the *Complaint*.

To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

Barbara Podlucky Berens, Esq.
Berens & Miller PA
3720 IDS Center
80 South 8th Street
Minneapolis, MN 55402

5.      Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7.      **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

Dated: December 8, 2023

**BERENS & MILLER, P.A.**

_s/Barbara Podlucky Berens_
Barbara Podlucky Berens (#209788)
80 South 8th Street
3720 IDS Center
Minneapolis, MN 55402
(612) 349-6171
bberens@berensmiller.com

**_Attorneys for Plaintiffs_**

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

                                                      Court File No.

Berens & Miller, P.A. and Barbara Berens,

            Plaintiffs,

vs.                                                   **COMPLAINT**

Apex Funding Source LLC,
Rob Eisenberg ("Eisenberg"), and Jane
and John Doe Investors,

            Defendants.

Plaintiffs Berens & Miller, P.A. and Barbara Berens ("Berens") (collectively "Plaintiffs") for

their Complaint against Defendants Apex Funding Source LLC, Rob Eisenberg ("Eisenberg"), and

Jane and John Doe Investors (collectively "Defendants"), state and allege as follows:

## INTRODUCTION

This is an action for violations of the Racketeer Influenced and Corruption Organizations

Act, 18 U.S.C. §§ 1961-68 ("RICO") brought by Plaintiffs against Apex Funding Group LLC, an

alleged merchant cash advance company (hereinafter "the MCA"), Eisenberg, the owner of the

MCA, the MCA's John and Jane Doe Investors and/or Funding Partners (the "Investors") (and all

Defendants together are "the Enterprise") arising from the Enterprise's unconscionable and

fraudulent Agreements to collect on an unlawful debt.

The RICO action is based on two "Merchant Agreements" (the "MCA Agreements")

pursuant to which the MCA purportedly paid a lump sum to allegedly purchase Berens & Miller's

future receipts at a discount and Berens & Miller agree to repay the face value of its receipts through

weekly payments.

1

While couched as the purchase of future receipts, the MCA Agreements' terms, conditions and the Defendants' actions demonstrate that despite the form of the Agreements, no sale of receipts ever took place, and the form was merely a sham to evade applicable usury laws. In reality, the transactions were loans for which Berens & Miller has been charged interest rates of more than **100%**, which are far greater than the maximum 25% for commercial loans permitted under New York law.

Moreover, the MCA's alleged risk is derivative or secondary, that is, Berens & Miller, as the borrower, always remains liable for the debt and bears the risk of its non-payment, while the MCA only bears the risk that the non-payment of receivables will leave Berens & Miller unable to pay. As a result, the MCA never made a bona fide purchase of Berens & Miller's receivables under the MCA Agreements and the transaction is, in reality, a loan.

As to the first MCA Agreement, Berens & Miller borrowed (and Berens guaranteed) a total of $539,830.00, with net proceeds of $370,000.00, which required weekly payments of $13,496.00. The interest charged pursuant to this first MCA Agreement was **169.62%**.

As to the second MCA Agreement, Berens & Miller borrowed (and Berens guaranteed) a total of $877,500.00, with net proceeds of $650,000.00, which required weekly payments of $24,375.00. Berens & Miller also paid a fee of $140,000.00 on this loan. The interest on this second MCA Agreement was **410.67%**.

**Pursuant to these and earlier MCA agreements, Berens & Miller has paid this MCA more than $3.600,00.00.**

Berens and Berens & Miller have now learned that this arrangement was made on the basis of fraudulent statements and the entire nature of the transaction was misrepresented and thus unenforceable.

It is against this backdrop that Plaintiffs file this Complaint.

2

**PARTIES**

1.  Berens & Miller, P.A. is a litigation law firm and a Minnesota S corporation.

2.  Berens is an attorney, and a resident and citizen of Minnesota.

3.  Apex Funding Group Inc. is a New York company and is in the business of doing merchant cash advances that are actually loans.

4.  Eisenberg is, upon information and belief, the owner of the MCA and a resident of Florida.

5.  The Investors are persons or entities unknown to Plaintiffs that provide funds to the MCA, and Plaintiffs therefore sue said Defendants by fictitious names.

**VENUE AND JURISDICTION**

6.  As a declaratory judgment action, this Court has jurisdiction over this matter pursuant to Minn. Stat. § 555.01, et seq.

7.  Venue is appropriate in this county pursuant to Minn. Stat. § 542.09 because the MCA engaged in fraud and unlawful lending, that is, intentional misconduct, which was purposefully aimed at Minnesota citizens, with the bulk of the resulting injury being felt by Plaintiffs in Minnesota, many of the actions at issue occurred in Hennepin County, Berens & Miller is located in Hennepin County, the unconscionable and fraudulent contracts at issue were executed by Berens & Miller and Berens in Hennepin County, and the choice of venue clause (for venue in New York) should be void as an overreaching and unconscionable provision of the Agreements at issue.

8.  This Court has personal jurisdiction over the MCA because it entered into the MCA Agreements at issue with residents of Minnesota and the basis for Plaintiffs' claims are the MCA Agreements, and the MCA, with the other Defendants, engaged in an unlawful conspiracy outside Minnesota but had the effects of harming the Plaintiffs, both Minnesota residents, in Minnesota and that this harm in Minnesota was foreseeable.

3

9. The Court has personal jurisdiction over the remaining Defendants because they engaged in an unlawful conspiracy outside Minnesota which had the effects of harming the Plaintiffs, Minnesota residents, in Minnesota and that this harm in Minnesota was foreseeable. In addition, Eisenberg and other representatives of the MCA have made numerous telephone calls and sent numerous emails to Berens & Miller in Minnesota.

10. The amount at issue and subject to the MCA Agreements exceeds $50,000.00.

## BACKGROUND OF THE MCA INDUSTRY

### A. The Predatory MCA Industry

12. As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1] The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2] As one of these brokers admitted, the "industry is absolutely crazy.... There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated."[3]

13. The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect rather than the ability of the borrower to repay without going out of business.

14. This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id.* ("[A]

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*

4

fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered.  Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

15.     The MCA companies only care about whether they can collect upon default, and not whether the small businesses on which they prey can survive.

**B.     MCA Agreements Are Substantively And Procedurally Unconscionable.**

16.     MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length and target small businesses facing a cash crunch and possible closure.

17.     These MCA Agreements contain a number of one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving the Plaintiffs, are really loans.

18.     Among the one-sided terms that are typical in MCA Agreements are:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security Agreements providing UCC liens over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) an assignment of the lease of merchant's premises in favor of the MCA

5

company, and (11) a power of attorney authorizing the MCA company "to obtain and adjust insurance" or "to take any action or execute any instrument or document to settle all obligations due...."

19.     All of the foregoing terms were included in the MCA Agreements that Berens & Miller entered into, and Berens guaranteed, with the MCA, and thus that MCA Agreements are unconscionable.

20.     The MCA Agreements is also unconscionable because it contains numerous knowingly false statements.  Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the weekly payment is a good-faith estimate of the receivables, (3) the fixed weekly payment is for the borrower's convenience, (4) that the automated ACH program is labor intensive (and not automated process), requiring the MCA to charge an exorbitant ACH Program Fee or Origination Fee.

21.     All of the foregoing false statements were included in the MCA Agreements Berens & Miller entered into and Berens guaranteed with the MCA, thus further demonstrating the unconscionability of the MCA Agreements.

22.     In addition, the MCA Agreements are unconscionable because it is designed to fail and cause the merchant to default.  Among other things, the MCA Agreements is designed to result in a default in the event that the merchant business suffers any downturn in revenues by:  (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of merchant.

23.     All of those provisions were also set forth in the MCA Agreements Berens & Miller entered and Berens guaranteed.

6

24.     The MCA Agreements also contain numerous improper penalties that violate New York strong public policy.  Among these improper penalties, the MCA Agreements to (1) accelerate the entire debt upon an Event of Default, and (2) require the merchant to turn over 100% of all of its receivables if it misses just one fixed weekly payment.

C.     **The Defendants Use a Sham Reconciliation Provision to Disguise the Loan.**

25.     In order to evade state usury laws, Defendants include a sham reconciliation provision in the MCA Agreements to give the appearance that the loan does not have a definite term.

26.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed weekly payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if income decreases, so do the payments.

27.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its weekly payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

28.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the MCA falsely represents that the fixed weekly payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the MCA ensures that if revenue decreases, the required fixed weekly payments remain the same.

29.     Upon information and belief, the MCA does not even have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

30.     In fact, the MCA Agreements specifically require the MCA to affirmatively reconcile the accounts each month, but it never did.

**D.      The Enterprise Intentionally Disguised the True Nature of the Transactions.**

31.      Despite its documented form, the transaction is, in economic reality, a loan that is absolutely repayable. Among other hallmarks of the fact that this transaction is really a loan are:

(a)      The weekly payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid New York's usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)      The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amount. The loan sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the weekly payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)      While the MCA Agreements purported to "assign" all of the merchant's future account receivables to the Enterprise until the purchased amount was paid, the merchant retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

(d)      Unlike true receivable purchase transactions, the MCA Agreements was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)      The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The amount of the weekly payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the Agreements;

(h)      The Enterprise required that the merchants undertake certain affirmative

8

obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)      The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## FACTUAL BACKGROUND OF THIS DISPUTE

### A.      Berens & Miller and Berens.

32.      At all times material hereto, Berens & Miller has been a small law firm that employs eleven persons.  Berens owns the law firm and is an attorney.  Despite that, Berens did not realize until recently that the MCA industry, and the MCA in particular, engaged in unlawful loans as opposed to legitimate merchant cash advances.

### B.      Berens & Miller and the MCA Industry

33.      In 2020, with the onset of COVID, Berens & Miller's legal practice declined because it is solely litigation law firm and litigation largely suspended during the Covid pandemic.  As a result, Berens & Miller needed financial assistance on occasion.  To obtain that financial assistance, Berens & Miller, without knowing, turned to the merchant cash advance industry.

34.      Berens & Miller was able to pay off most of the loans it obtained, which Berens & Miller at that point in time incorrectly believed were merchant cash advances on its receivables.

35.      In 2022, Berens & Miller turned to the MCA for financial assistance as it was in the process of repaying earlier loans.

36.      Like many MCA companies, the MCA and the Enterprise take advantage on cash-strapped businesses that need financing quickly.  Although the MCA Agreements is titled "Merchant

9

Agreements," and purports to represent the sale and purchase of businesses' future receivables, the Enterprise markets, underwrites, and collects upon its transactions as loans, with interest rates far above those permissible under state law, in this case, New York law.

37.     The Enterprise also demonstrates via its underwriting practices, that its Agreements are loans, and not merchant cash advances.  Typically, banks and other legitimate institutions that purchase receivables perform extensive due diligence into the creditworthiness of the parties whose receivables they are purchasing.  When underwriting new transactions, the Enterprise does a cursory evaluation of merchant's receivables which are the assets they fraudulently claim they are buying, and instead focus almost exclusively on a merchant's credit rating and bank balances (if they do any due diligence at all).

38.     That is exactly what the MCA did before loaning Berens & Miller the funds at issue in this case and obtaining Berens' personal guarantee.

39.     The MCA also filed UCC liens as a secured creditor against Berens & Miller and Berens, which liens are consistent only with loan arrangements.

40.     Moreover, when the Enterprise goes to collect upon its Agreements, it also treats those purported merchant cash advances just like loans.  For example, it requires a merchant to make fixed weekly payments and grants security interests to the Enterprise in substantially all of the merchants assets to insure all of the weekly or weekly payments are made.

41.     In their marketing, the Enterprise expressly describes the transactions as "loans" and describe themselves as "lenders."

42.     The Enterprise also consistently describes its products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

43.     Again, this is exactly what the MCA and their representatives did with Berens &

10

Miller. In numerous conversations with Berens & Miller, representatives of the MCA stated that the financial arrangements were loans.

44.     The Enterprise also shows in its underwriting practices that their Agreements are loans. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing. When underwriting new transactions, the Enterprise does not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

45.     The same was true with Berens & Miller before the MCA agreed to make the loans to Berens & Miller and Berens personally guaranteed the loans.

46.     When the Enterprise goes to collect upon its Agreements, it treats them just like loans. For example, it requires the merchant to make fixed weekly payments and grant security interests to the Enterprise in substantially all of the merchant's assets to ensure that the weekly payments are made, as was required of Berens & Miller.

47.     Berens & Miller, as borrower, and Berens, as guarantor, thus fell victim to all of these predatory tactics when agreeing to the loans with the MCA.

      a.     The July 12, 2022 Agreement with the MCA

48.     Under the July 12, 2022, MCA Agreement, Berens & Miller borrowed (and Berens guaranteed) a total of $539,830.00, with net proceeds of $370,000.00, which required weekly payments of $13,496.00. The interest rate on this loan was **169.62%.**

49.     Berens & Miller's obligations were secured by the grant of a security interest in substantially all of Berens & Miller's assets.

50.     Berens was also required to personally guarantee this unlawful loan.

b.   The August 30, 2022 Agreement with the MCA

51.   Under the August 30, 2022 MCA Agreement, Berens & Miller borrowed (and Berens guaranteed) a total of $877,500.00, with net proceeds of $650,000.00, and weekly payments of $24,375.00. Berens & Miller also paid a fee of $140,000.00 on this loan. The interest on loan on this second MCA Agreement was **410.67%.**

52.   Under a series of these MCA Agreements with the MCA, Berens & Miller has paid the MCA more than $3,600,000.00. Berens and Berens & Miller then learned that courts have ruled that such MCA Agreements are fraudulent and unconscionable Agreements and that the merchant cash advance participants violate RICO when conducting their business. As a result, Berens & Miller and Berens commenced this lawsuit.

**FIRST CAUSE OF ACTION**
**(RICO: 18 U.S.C. § 1962)**

53.   Plaintiffs repeat and reallege all of the paragraphs in the Amended Complaint as though set forth here.

**A.   The Unlawful Activity.**

54.   There are two predicate acts underlying the First and Second Causes of Action. First, the making of unlawful debts and second, the engagement in wire fraud.

55.   As set forth more fully above, despite the many false statements and contract terms to the contrary, the financial arrangement between the MCA and Berens & Miller was a loan, and not a merchant cash advance.

56.   More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a business loan. In New York, that limit on business loans is 25%.

57.   Here, the interest rates that Berens & Miller was paying on the loans were much

12

greater than the permitted interest rate.

58.     The disclosures Defendants made about the loan are clearly fraudulent (for example, the MCA Agreements' representation that this arrangement should not be "construed" as a loan. This loan violates New York usury law, as set forth more fully herein.

**B.     Culpable Persons.**

59.     Eisenberg, the MCA, and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

60.     At all relevant times, each of Eisenberg, Ba, and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

61.     Upon information and belief, Eisenberg owns the MCA, and he is the mastermind of the Enterprise.

62.     The John and Jane Doe Investors are individuals and business entities that provide funding for illegal and grossly usurious loans, including this one.

63.     Through their operation of and engagement with the MCA, the Culpable Persons solicit, underwrite, fund, service and collect upon unlawful debt incurred by small businesses like Berens & Miller.

**C.     The Enterprise.**

64.     Eisenberg, the MCA, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

65.     Eisenberg, the MCA, and the John and Jane Doe Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest greatly in excess of the permitted interest rate

13

under the laws of New York.

66.     Since at least 2021 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or Agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

67.     The debt evidenced by Berens & Miller's MCA Agreements constitutes unlawful debt within the meaning of 18 U.S.C. §§ 1962(c), 1962(d), and § 1961(6) because:  (i) it violates applicable criminal usury statutes, and (ii) the rates are more than four times greater than the legal rate permitted under New York law.

68.     Since at least 2021 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or Agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

69.     The Enterprise's misconduct also constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.      The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

70.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

      i.      **Rob Eisenberg**

14

71.     Upon information and belief, Eisenberg is an owner and the mastermind of the Enterprise.   He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

72.     In his capacity as the mastermind of the Enterprise, Eisenberg is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including:  (i) the form of merchant Agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase Agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; and (ii) the method of collecting the weekly payments via ACH withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Berens & Miller.

73.     Eisenberg has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

74.     Eisenberg has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the MCA and to the John and Jane Doe Investors.

ii.     **The MCA**

75.     The MCA is organized under the laws of Florida and maintains officers, books, records, and bank accounts independent of Eisenberg, and the John and Jane Doe Investors.

76.     Eisenberg and the John and Jane Doe Investors have operated or engaged with the MCA as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.

15

Pursuant to its membership in the Enterprise, the MCA has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation Agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant Agreements on behalf of the Enterprise; (v) serviced the usurious loans; and (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt.

77.     In this case, the MCA, through Eisenberg and the John and Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting weekly ACH withdrawals from the bank accounts of Berens & Miller.

### iii.     The John and Jane Doe Investors

78.     The John and Jane Doe Investors are, upon information and belief, a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the MCA and Eisenberg.

79.     Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the MCA with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement Agreements and other financial arrangements with borrowers to collect upon the unlawful debts.

80.     The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level

16

of participation in the usurious loans.

  **E.**  **Interstate Commerce**

  81.  The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its weekly business activities.

  82.  Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Minnesota, including Berens & Miller, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

  83.  In the present case, all communications between the members of the Enterprise and Berens & Miller were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreements, fund the advance under the Agreements and collect the weekly payments via interstate electronic ACH debits.

  **F.**  **Injury and Causation.**

  84.  Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

  85.  The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments.

  86.  Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

  87.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

88.    Plaintiffs repeat and reallege all of the paragraphs in Amended Complaint as though set forth herein.

89.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

90.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loan, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

91.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the loan under the MCA Agreements.

92.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern

18

of racketeering activity in violation of 18 U.S.C. 1962(c).

93.     The participation and Agreements of each of Defendant was necessary to allow the commission of this scheme.

94.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

95.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

96.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

97.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
### (Declaratory Judgment)

98.     Plaintiffs repeat and reallege all of the paragraphs in the Amended Complaint as though fully set forth herein.

99.     An actual controversy exists regarding the unconscionability and unlawfulness of the MCA Agreements with Defendants.

100.    Plaintiffs are therefore seeking from the Court a declaration that for the reasons set forth herein, the MCA Agreements with Defendants are both unconscionable and unlawful, and therefore are void and unenforceable.

101.    Plaintiffs are also seeking a declaration that the MCA Agreements are usurious loans in violation of the laws of New York and are thus void and unenforceable.

19

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

a)   Declaring that Plaintiffs' MCA Agreements with Defendants are unconscionable and unlawful, and therefore void and unenforceable;

b)   Declaring Plaintiffs' MCA Agreements with Defendants are usurious loans in violation of the laws of New York and thus void and unenforceable;

c)   That Defendants have violated 18 U.S.C. § 1962;

d)   Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

e)   Awarding treble damages;

f)   Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

g)   Any further relief deemed appropriate by the Court.

Dated:   December 8, 2023

BERENS & MILLER, P.A.

s/Barbara Berens
Barbara Berens, #209788
Kari Berman, #256705
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171

*Attorneys for Plaintiffs*

20

**ACKNOWLEDGMENT**

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, subd. 2, to the party against whom the allegations in this pleading are asserted.

<em>s/</em>Barbara Berens